## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MAINE

In re:                                      )
                                            )
ANTHONY D. PETTEGROW and        )        Chapter 11
JOSETTE G. PETTEGROW,            )        Case No. 25-10186 PGC
                                            )
            Debtors.                    )

## DEBTORS ANTHONY D. PETTEGROW AND JOSETTE G. PETTEGROW'S
## OPPOSITION TO MOTION TO DISMISS CASE

NOW COME Debtors and Debtors-in-Possession, Anthony D. Pettegrow and Josette G. Pettegrow (together, "Debtors"), pursuant to 11 U.S.C. §§ 105 and 1112(b), Federal Rules of Bankruptcy Procedure 9013 and 9014, and D. Me. LBR 9013-1 and 9014-1, and hereby oppose the Motion to Dismiss, dated October 10, 2025 (D.E. 14) ("Motion") filed by Lobster 207, LLC ("L207").

The United States Bankruptcy Court for the District of Maine does not recognize "bad faith" for purposes of "cause" under § 1112(b) of the United States Bankruptcy Code ("Code"). *See* In re Kevin B. Dean, Ch. 11, Case No. 20-20427 (Order Denying Motion to Dismiss for bad faith filing under 11 U.S.C. § 1112(b) (D.E. 72) (Oral Decision and Ruling (D.E. 73)).

If consistency, predictability, and fidelity to the United States Supreme Court's directive that bankruptcy courts adhere to the plain language of the Code are valid judicial goals and can be relied upon by practitioners appearing before this Court, then the Motion will be denied outright, as a matter of law, in accordance with existing precedent in this district.

If, however, the Court prefers the non-binding (but undoubtedly persuasive authority under the circumstances) test for "bad faith" under § 1112(b) set forth in *La Trinidad Elderly LP SE*, 627 B.R. 779, 799 (B.A.P. 1st Cir. 2021) over consistency, predictability, and the plain language of the

Code, then the Motion to dismiss is finished anyway.[1]  In support of their Opposition, Debtors state as follows.

## I. Constitutional and Statutory Authority, Jurisdiction, and Venue

1.       This Court possesses Constitutional authority to issue final orders and judgments in this contested matter, it has jurisdiction pursuant to 28 U.S.C. § 1334(b), this is a statutorily-core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O), and venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. Background

2.       On October 1, 2025 ("Filing Date"), Debtors commenced this voluntary proceeding under Chapter 11 of the Code.

3.       On their Schedule A/B, Debtors list sixteen separate real property holdings with a total approximate value of $10 million dollars.  *See* Schedule A/B, ¶¶ 1.1 – 1.16 (D.E. 22).

4.       Debtors also list a number of vehicles, watercraft, and motorcycles with a value of $105,400.  *See* Schedule A/B, ¶¶ 4.1 – 4.6.

5.       Debtors have multiple accounts with over $16,000 and an IRA of $700,000.  *See* Schedule A/B, ¶¶ 17, 21.  They are the custodian of a 529 Plan for their granddaughter, which has a balance of $80,000.  *Id.* ¶ 24.

6.       They are members and shareholders of three separate entities, Trenton Bridge Lobster Pound, Inc. ("TBLP") (100% shareholders), Anchor Ave, LLC (66.66% membership interests), and Pettegrow Properties, LLC (99% membership interests).  *See* Schedule A/B, ¶ 42. These entities own assets as well.

---

[1] *See In re Smith*, 573 B.R. 298, 301 (Bankr. D. Me. 2017), *aff'd sub nom. Smith v. Maine Bureau of Revenue Services*, 590 B.R. 1 (D. Me. 2018), *aff'd sub nom. In re Smith*, 910 F.3d 576 (1st Cir. 2018) ("The BAP's decisions must be given consideration as significant and persuasive authority, but there is no law definitively establishing that the decisions of the BAP are binding on bankruptcy courts within the First Circuit.").

7.      On their Schedule C, Debtors claim all the usual exemptions for their various interests in certain real property, vehicles, retirement accounts, and the like.  *See* Schedule C.

8.      On their Schedule D, Debtors list four secured creditors with total claims of approximately $700,000.  *See* Schedule D, ¶¶ 2.1 – 2.4.  L207 is listed on Schedule D with a disputed claim in the amount of:  "Unknown."  Id. ¶ 2.3.  The other secured creditors have mortgage and other liens against certain of Debtors' real and personal property.  *See* Schedule D, ¶¶ 2.1, 2.2, and 2.4.

9.      On Debtors' Schedule E/F, they list nine priority and general unsecured creditors with total claims of approximately $250,000.  *See* Schedule E/F, ¶¶ 2.1 – 2.3, 4.1 – 4.6.  Notably, Troutman Pepper Hamilton Sanders LLP ("Troutman") possesses a general unsecured claim for "legal services" in the amount of $247,000.  *Id*. ¶ 4.5.

10.      Debtors have an executory contract with MaineHousing through which an elderly individual resides at one of their properties and $700 in rent is paid directly by MaineHousing. *See* Schedule G.

11.      According to Debtors' Schedules I and J, they have monthly net income of approximately $5,000.  *See* Schedules I and J.

12.      As set forth on Debtors' Statement of Financial Affairs ("SOFA"), while they only earned gross income of $45,600 in 2025, in 2024 they had gross income of $410,600 from operating a business.  *See* SOFA ¶ 4.  That business is primarily TBLP.

13.      TBLP is a family-owned lobster and seafood restaurant operating in Trenton, Maine for the past 60+ years.  It is also the same business that L207 wants nothing more than to put out of business by directly competing with it just a few miles down the road.[2]

---

[2] Apparently, though, as complained about in its Motion, L207 has been hindered and frustrated in doing so because its business model appears to be solely dependent on collecting a $3.2 million dollar stipulated judgment from Debtors

14.     Although the underlying civil action was concluded as of the Filing Date, Debtors are the subject of a Disclosure Proceeding commenced by L207 in the United States District Court for the District of Maine ("District Court") in the case entitled, Lobster 207, LLC v. Warren Pettegrow, et al., Case No. 1:19-cv-00552 ("Civil Action").  *See* SOFA ¶ 9.

15.     A hearing was scheduled in the Disclosure Proceeding on October 2, 2025, the day immediately after the Filing Date.  But it did not go forward because fairly well-established federal law prevented it from doing so, as has happened in innumerable bankruptcy cases across the country in every single district every single year since October 1, 1979.  *See* 11 U.S.C. § 362(a). That proceeding is currently stayed.

16.     Had it gone forward, the Disclosure Hearing was sure to be the next chapter in the 6-year litigation between L207 and Debtors, their son Warren Pettegrow ("Warren"), and their entities, TBLP (owned by Debtors) and Poseidon Charters, Inc. ("Poseidon Charters") (owned by Warren).[3]

17.     In December 2019, L207 commenced the Civil Action in District Court against Warren, Debtors, TBLP, Poseidon Charters, and others for breach of contract and other claims.[4]

18.     Of particular note here, in June 2020, the District Court issued its Memorandum of Decision on Plaintiff's Motion for Attachment and Trustee Process in the Civil Action ("Attachment Order").

---

without any seeming backup or contingency plan in case Debtors, for whatever reason, were unable to satisfy the stipulated judgment on the timetable as hoped and expected.  No Plan B?

[3] Undersigned counsel began representing Debtors in relation to the Civil Action in 2022.

[4] L207 helpfully attached a copy of the First Amended Complaint to its Motion.  It is an interesting read and narrative. Debtors filed responsive pleadings in the Civil Action essentially denying and rejecting everything about L207's fictional accounts in their pleadings.

19.     The District Court's Attachment Order granted L207 a prejudgment attachment against Debtors in the amount of $1,438,181.23.

20.     In June 2020, L207 recorded the Attachment Order in the Knox, Washington, and Hancock County Registries of Deed, thereby creating $1.438 million dollar judicial liens in favor of L207 and upon Debtors' interests in all real estate in all those counties (not otherwise exempt).

21.     Five years later and on the eve of trial in early 2025, L207, Debtors, Warren, TBLP, Poseidon Charters, and others entered into a certain Settlement Agreement and Release of Claims ("Settlement Agreement") with regard to, *inter alia*, the Civil Action.

22.     Under the Settlement Agreement, Debtors and other defendants were required to consent to judgment in the Civil Action.   Debtors were also required to stipulate to the nondischargeability of their obligations to L207 under 11 U.S.C. § 523(a)(2), (4), and (6).

23.     On June 17, 2025, the District Court issued its Consent Judgment in the Civil Action and in furtherance of the Settlement Agreement.

24.     Pursuant to the Consent Judgment, the District Court entered judgment, by consent of all defendants, in favor of L207 and against Debtors, Warren, TBLP, and Poseidon Charters in the principal amount of $4,924,000, plus pre-and post-judgment interest, costs, and reasonable attorney fees ("Total Judgment Amount").

25.     Pursuant to the Consent Judgment, Warren and Poseidon Charters were required to pay L207 the principal sum of $1,724,000 of the Total Judgment Amount, with the balance being the judgment obligation of Debtors and TBLP (*i.e.*, principal of $3.2 million dollars).[5]

---

[5] Warren and Poseidon Charter's settlement amount arose out of a Bankruptcy Court approved Rule 9019 compromise reached between and among Warren, Poseidon Charters, and L207 in the Chapter 11 cases commenced by Warren and Poseidon Charters in the United States Bankruptcy Court for the District of Florida, entitled Warren B. Pettegrow, Ch. 11, Case No. 24-12140 and Poseidon Charters, Inc., Ch. 11, Case No. 24-17002.  So this is not the first Chapter 11 case to arise because of the financial strains and consequences of the Civil Action.  L207 also moved to have Warren's Chapter 11 case dismissed under § 1112(b) of the Code for a purported bad faith filing. *See* (D.E. 57).  The Florida Bankruptcy Court never reached a ruling on the motion because the parties reached the compromise.

26.     On July 17, 2025, the Clerk issued a Writ of Execution in favor of L207 and against Debtors and TBLP in the sum of $3,481,498.85, plus pre- and post-judgment interest, reasonable expenses of enforcement of the Writ of Execution, including costs and attorneys' fees.

27.     In July 2025, L207 recorded the Writ of Execution in the Hancock, Washington, and Knox County Registries of Deeds.

28.     Between February 2025 and September 30, 2025, Debtors, TBLP, and Warren caused, directly or indirectly, L207 to be paid in excess of the amount of $1,724,000 of the Total Judgment Amount against Debtors, Warren, TBLP, and Poseidon Charters. *See also* SOFA ¶ 7.

29.     Based upon the foregoing, on October 29, 2025, Debtors commenced an Adversary Proceeding against L207 seeking to avoid, under 11 U.S.C. § 544 and the Maine Uniform Fraudulent Transfer Act ("MUFTA"), L207's judicial liens against Debtors' real property arising from the recording of the Writs of Execution. *See* Anthony D. Pettegrow and Josette G. Pettegrow v. Lobster 207, LLC, Adv. Proc. No. 25-1002 (the "Adversary Proceeding").

30.     Ten days after the Filing Date, L207 filed its Motion seeking the dismissal of Debtors' Chapter 11 case on the grounds of "bad faith" filing under § 1112(b) of the Code.

31.     Tellingly, L207 filed its Motion twelve days before Debtors' Schedules were even on file on October 22 (although it was apparent from other pleadings that Debtors have numerous creditors, even before the Schedules were filed).

### III.  Discussion

### A.     11 U.S.C. § 1112(b) – Standard

32.     "Section 1112(b) governs conversion or dismissal of a chapter 11 case.  Section 1112(b)(1) and (2) provide, in pertinent part, as follows:  (1) Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall

convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause . . . ." *Andover Covered Bridge, LLC*, 553 B.R. 162, 171 (B.A.P. 1st Cir. 2016).

33.     "When an interested party files a motion to convert or dismiss a Chapter 11 case, the bankruptcy court inquires as follows:  Does 'cause' exist to convert or dismiss the case; and, if so, is conversion or dismissal in the best interests of creditors and the estate?  See 11 U.S.C. § 1112(b)(1)."  *In re Hoover*, 828 F.3d 5, 8 (1st Cir. 2016); *see also In re Capitol Food Corp.*, 490 F.3d 21, 24 (1st Cir. 2007) ("The Bankruptcy Code prescribes that the bankruptcy court may dismiss a chapter 11 case for 'cause.'  11 U.S.C. § 1112(b)(1).").

> "The initial burden is on the movant to prove there is cause for either conversion or dismissal of the chapter 11 case.  [*In re Efron*], 529 B.R. 396, 411 (1st Cir. BAP 2015).  Once the movant establishes cause, the burden shifts to the opposing party to demonstrate "unusual circumstances" establishing that conversion or dismissal is not in the best interests of the creditors and the estate, and that it meets the other requirements of § 1112(b)(2)."  *Andover Covered Bridge, LLC*, 553 B.R. at 171-72; *see also In re Syndicom Corp.*, 268 B.R. 26, 49 (Bankr. S.D.N.Y. 2001) (Gerber, J.) ("With respect to motions seeking a finding of cause based on bad faith, or a lack of good faith, once the good faith of a debtor is called into question, the burden shifts to the debtor to demonstrate that the petition was filed in good faith.").

**B.     In re Dean – This Bankruptcy Court's Excusal of The Worst of the Worst of All Bad Faith Filers, Ever[6]**

34.     "The issue of whether lack of good faith ('bad faith') constitutes cause for dismissal is 'unsettled,'" *see La Trinidad Elderly LP SE*, 627 B.R. at 799 – except in this District.

---

[6] *See, e.g., United States v. Bilodeau*, 24 F.4th 705, 715 (1st Cir. 2022) ("But as the district court found, . . .Kevin Dean, was up to his eyeballs in the actual substance of the marijuana distribution scheme.  He was a close associate of Bilodeau, on whose ledgers were recorded various payments to 'Kevin' and 'Kev.'  Dean was himself registered to grow and partnered with Bilodeau to buy a marijuana trimming machine.  Dean came up with no evidence that any of the marijuana that he grew or trimmed went to any qualifying patient.").  Dean's counsel in his entity's criminal proceeding (before he filed his own Chapter 11 case in which he easily overcame a motion to dismiss on "bad faith" filing grounds and was somehow permitted to file 6 patently non-confirmable Chapter 11 plans over a span of 2 years) is the same counsel for L207 in the Civil Action – McCloskey, Mina, Cunniff & Frawley.  Small world.

35.     Here, this Bankruptcy Court has conclusively settled the issue.  And it has done so dispositively in favor of Debtors.

36.     Just a few short years ago, this Bankruptcy Court in <u>Dean</u> unequivocally and strongly found and determined that "bad faith" does not constitute "cause" for purposes of 1112(b) of the Code and cannot be the basis for the conversion or dismissal of a Chapter 11 case.  *See* <u>Kevin B. Dean</u>, Ch. 11, Case No. 20-20427 (D.E. 72; D.E. 73).  So that is the end of it – assuming consistency, predictability, and fidelity to the plain language of the Code remain important judicial goals, mean anything, and can guide practitioners in advising clients contemplating a Chapter 11 filing.

37.     Clearly, though, L207 and its counsel must never have heard or be aware of <u>Dean</u>, because in their Motion they describe <u>this</u> case as "a paradigm example of bad faith[.]"  Motion, p.1  For if either L207 or its counsel were aware of <u>Dean</u> prior to filing their Motion, and they were presumably interested in maintaining any semblance of credibility with regard to their arguments against Debtors here, they almost certainly would have sought to distinguish <u>Dean</u> from this case, by arguing, for instance, that Dean – both pre- and (then <u>egregiously</u> so post)[7] - petition – was <u>the</u> "paradigm example of bad faith," but yet these Debtors nonetheless satisfied enough of

---

[7] *See In re Dean*, 2021 WL 5237302, at *1 (Bankr. D. Me. Nov. 4, 2021) ("Marcus Clegg received post-petition payments from Cecile Dean on behalf of the Debtor and made a calculated decision not to disclose those payments to the Court within the timeframe required by Fed. R. Bankr. P. 2016(b).  As a sanction for Marcus Clegg's admitted failure to comply with Rule 2016(b), as well as its filing of false monthly operating reports on the docket in this case,… any fees and expenses awarded to Marcus Clegg under the United States Bankruptcy Code in the future will be reduced by $100,000.").  An undisclosed payment arrangement between Marcus Clegg and a debtor?  Undisclosed payments from a debtor to Marcus Clegg?  No Rule 2016(b) Statement, amended or otherwise?  Sounds familiar but cannot quite place it.  The Bankruptcy Court at the sanctions hearing indicated that if such conduct happened again, then Marcus Clegg may be barred from practicing before the Court.  Marcus Clegg should have been disqualified and required to disgorge the $400,000 it received from Cecile and Kevin Dean, period.  *See* 11 U.S.C. §§ 327 and 329(a), Federal Rules of Bankruptcy Procedure 2014(a), 2016(b), and D. Me. LBR 2014-1, 2016-1(a) and (b), and 2016-2; *see also Rome v. Braunstein*, 19 F.3d 54, 57–58 (1st Cir. 1994); *In re Indep. Eng'g Co., Inc.*, 232 B.R. 529, 531–32 (B.A.P. 1st Cir. 1999), aff'd, 197 F.3d 13 (1st Cir. 1999); *In re Martin*, 817 F.2d 175, 180–81 (1st Cir. 1987); *See In re Remington Dev. Group, Inc.*, 168 B.R. 11, 15–16 (Bankr. D.R.I. 1994) (Haines, J.); *In re Saturley*, 131 B.R. 509, 517 (Bankr. D. Me. 1991); *In re Stewart*, 970 F.3d 1255, 1264–65 (10th Cir. 2020).

the 8-part test for a bad faith filing set forth in *La Trinidad Elderly LP SE*.  But they do not.

38.     To be clear, it is undersigned counsel's view that this Bankruptcy Court's decision and Order in <u>Dean</u> was then, and is now, completely wrong.  The <u>Dean</u> case should have been dismissed a month after it was filed.  Some counsel for <u>Dean</u> may well have wished it was.  *See, fn.* 8, *supra.*  But it makes no difference what undersigned counsel thinks or believes.  He and his clients, just like opposing counsel and L207, are bound by this Court's Order and decision in <u>Dean</u>, rightly or wrongly.  The Motion must be denied.

**C.     *La Trinidad Elderly LP SE* – A Thoughtful Approach Overwhelmingly <u>Supporting the Bona Fides and Good Faith of Debtors' Chapter 11 Case</u>**

39.     In the event that the Bankruptcy Court departs from its position in <u>Dean</u>, as Debtors suspect it will, then the 8-factor test set forth in *La Trinidad Elderly LP SE* for assessing a filing's "good" or "bad" faith demonstrates, conclusively, that Debtors' Chapter 11 case is sincere.

40.     "In the analysis of whether a case has been filed in bad faith, [some] courts have used an eight-factor test….  The eight factors are:

(1)     the debtor has only one asset;
(2)     the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;
(3)     the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;
(4)     the debtor's financial condition is, in essence, a two[-]party dispute between the debtor and secured creditors which can be resolved in the pending state court foreclosure action;
(5)     the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;
(6)     the debtor has little or no cash flow;
(7)     the debtor cannot meet current expenses, including the payment of personal property and real estate taxes;
(8)     the debtor has no employees.

*La Trinidad Elderly LP SE*, 627 B.R. at 800–01.  Debtors addresses each factor in turn.

### 1.    Debtors have Only One Asset

41.    Nope.  This factor favors Debtors.  Debtors have sixteen separate parcels of real property alone worth in excess of $10 million dollars.  *See* Schedule A/B.

42.    They have multiple vehicles and watercraft.  *See* Schedule A/B.  They have multiple bank and retirement accounts.  *Id.*  They are owners of three separates businesses, all of which their own assets and real property with, in some instances, substantial value.  *Id.*  Debtors do not have just one asset.  This factor strongly favors Debtors.

### 2.    Debtors have Few Unsecured Creditors Whose Claims are Small in Relation to Secured Creditors

43.    This factor favors Debtors.  Debtors currently have 13 unsecured creditors with total claims of $250,000, and four secured creditors with claims of $700,000.  *See* Schedules D, E/F.  That approximately 1/3 ratio of unsecured to secured debt is not small, and 13 unsecured creditors is definitely a lot more than a few.

44.    Notably, Debtors owe their former counsel (among the many they were required to hire in the Civil Action) Troutman approximately $247,000.  *See* Schedule E/F, ¶ 4.5.  That $247,000 figure also assumes that Troutman does not seek an additional $100,000 from Debtors in this case, because the $247,000 was a discounted amount that Troutman was willing to provide to Debtors if they were able to maintain a monthly payment plan toward the debt, which Debtors were unable to do prepetition.

45.    The claim, when filed by Troutman, will likely exceed $350,000.  Generally speaking, a general unsecured claim of $350,000 is a substantial claim against any debtor.

46.    Further, while L207 is currently listed as a secured creditor in an unknown amount, in Debtors' Adversary Proceeding they are seeking to avoid L207's judicial liens against Debtors' real properties in their entirety.  If Debtors are successful in that regard, it will render L207 an

entirely unsecured creditor of Debtors and their estates with an unsecured claim of approximately $3.4 million dollars.

47.     Such a result would have substantial and substantive consequences for both Debtors and L207 in this case.  One, post-judgment interest and any of L207's legal fees incurred in this case or otherwise under the Stipulated Judgment will stop and be uncollectible.  *See* 11 U.S.C. § 506.  That is not a result that can be achieved outside of bankruptcy, but in this case, it can.

48.     Upon the avoidance of its judicial liens, L207 will simply become an unsecured creditor in this case along with all the other 13 unsecured creditors, albeit with the largest pro rata claim.  In Debtors' proposed Chapter 11 plan, which Debtors hope to file relatively shortly, L207 will no longer be treated as a secured creditor in its own class, but instead will be included in the class of all creditors holding allowed general unsecured claims.  Under the § 1129 factors for confirmation, that shift will have material and positive long-term benefits for Debtors and their estate, again, which cannot be achieved outside of bankruptcy.  It also makes confirmation of a Chapter 11 plan substantially more likely.  This factor favors Debtors.

### 3.     Debtors' One Asset is Subject of a Foreclosure Action as a Result of Arrearages or Default on Debt

49.     This factor favors Debtors.  Debtors do not have just one asset.  They have more than 16 separate parcels of valuable real estate alone.  *See* Schedule A/B.  None of those properties are the subject of a foreclosure action due to arrearages and default of secured debt.  *See* Schedule D and SOFA ¶ 9.  Unless this factor means something other than what it says it means, it goes into Debtors' column.

### 4.     Debtors' financial condition is, in essence, Two-Party Dispute Between Debtors and a Secured Creditor that Can be Resolved in Pending State Court Foreclosure Action

50.     This factor favors Debtors.

51.    One, there is no "pending state court foreclosure action" by a secured creditor. *La Trinidad Elderly LP SE*, 627 B.R. at 801.    There is a Disclosure Proceeding pending with a currently-secured creditor, L207, possessing vulnerable judicial liens against all Debtors' real property and which are subject to avoidance under MUFTA.    That is not the same thing as a foreclosing lender/mortgagee with an unavoidable mortgage interest in a single real property asset.

52.    Two, Debtors' Schedules demonstrate that their financial condition – *i.e.*, the sum of all their debts when compared to their assets – is not objectively dire or insurmountable.    *See* Schedule A/B, D, E/F.    But they do currently lack liquidity, and when a debtor has substantial assets in comparison to their debts but without liquidity, Chapter 11 is uniquely equipped to provide such debtors the time to reorganize their financial affairs to alleviate that near-term cash problem with longer-term repayment plans that are fair to <u>all</u> a debtor's creditors.    *See generally* 11 U.S.C. §§ 1121 – 1129, 1141, 1142, 1143.

53.    Three, Troutman likely does not share L207's dismissive attitude toward its $250,000 – $350,000 unsecured claim and would like to be paid.

54.    In turn, Debtors would like to pay Troutman for, in particular, defeating and debunking L207's baseless and unsuccessful conflation of what was in essence a banal, state law breach of contract and common law claim case, into a sprawling RICO extravaganza advanced by a firm of former federal prosecutors that only see the world through that lens.    *See* Exhibit A to L207's Motion to Dismiss (Counts I, II) ("Racketeering Activity" pursuant to 18 U.S.C. § 1962).

55.    Recovery under RICO, of course, provides not just for the amount of any "ultimate loss," but "trebled" damages, "plus interest, costs and attorneys' fees" Motion to Dismiss, Exhibit A, ¶ 284.    In other words, if you breach a contract and owe someone $1,000, then you owe them $1,000.    But if you also violate federal racketeering laws designed to curb organized crime (right

here in our very own Trenton, Maine) for $1,000, then all of sudden the plaintiff is entitled $1,000

for the loss, $3,000 for the treble, $20,000 for the "reasonable" legal fees to get there, and then

interest on top of all that.

56.     Fortunately Troutman substantially put a stop to all that and it should be paid for

its efforts.  After all, the District Court's Attachment Order in 2020 was $1.4 million dollars, not

$4.2 million.

57.     L207 may view this Chapter 11 case as a two-party dispute, but Debtors do not.

They view it as a reorganization effort that treats all thirteen of their secured and unsecured

creditors fairly under the Code and does not require them to fire sale and liquidate their valuable

assets for the benefit of one eventually-unsecured creditor to the detriment of all their others.

58.     This factor favors Debtors.

     **5.**     **Timing of Debtors' Filing Evidences Intent to Delay or Frustrate
Legitimate Efforts of Debtors' Secured Creditors to Enforce their
<u>Rights</u>**

59.     This factor favors Debtors, but it does take a little more explaining why than the

other factors.

60.     Debtors filed this Chapter 11 case on the eve of their Disclosure Hearing in District

Court.  True.  That filing delayed and frustrated L207 and its desire implement its rights as a

judgment creditor under 14 M.R.S. §§ 3120 – 3138.  True.

61.     But a judgment creditor's rights and remedies under 14 M.R.S. §§ 3120 – 3138 are

not the only rights and remedies a creditor with a judicial lien possesses, and the timing for the

enforcement of those other rights and remedies is entirely up to the judgment creditor to initiate

the moment after a writ of execution is recorded.  *See, e.g.,* 14 M.R.S. §§ 4751, 4752; Maine Rule

of Civil Procedure 69.  So while the timing of Debtors' filing of this case admittedly delayed the

Disclosure Hearing and surely frustrated L207, it did nothing to delay or frustrate L207's other rights and remedies as a judicial lienholder vis-à-vis Debtors' assets. *Id.*

62.    Nor did Debtors file this case with the <u>intention</u> of frustrating and delaying L207. The intention in filing this case was to avoid a fire sale and liquidation of Debtors' valuable assets solely to satisfy a single creditor's claim. And Chapter 11 is the only place that Debtors have the necessary control over the process to do that.

63.    In its Motion, L207 falls all over itself to emphasize that its stipulated judgment is nondischargeable under § 523(a)(2), (4), and (6), and that, of course, that must mean that Debtors are bad people and that they are abusing the Chapter 11 process because the debt is not going to be dischargeable anyway so there is no reorganizational purpose to the filing. *See* Motion, pp. 3, 5, 12 – 15. The only way that argument can be made with sincerity is to fundamentally not understand the situation Debtors, L207, and Debtors' other creditors find themselves in.

64.    For basically the same reasons that Debtors were perfectly fine with stipulating to the nondischargeability of L207's Stipulated Judgment under § 523 of the Code, they determined that settling with L207 for, in essence, $3.2 million dollars made sense in January 2025 – their assets far outstrip their actual (and then potential) liabilities.[8]

65.    Because Debtors' assets exceed their liabilities, and their liabilities exceed $3.4 million dollars, even if Debtors were required to file Chapter 11 to reorganize, then that plan would <u>have</u> to be a 100% repayment plan for their creditors. So it made, and makes, no difference that their debts to L207 are not dischargeable. L207's allowed claim will have to be paid, in full, under any plan and in accordance with the Code. If you understand that, then you do not make the

---

[8] If L207 had insisted that Debtors also stipulate in the Consent Judgment that L207s' counsel has a terrific sense of humor, then they would have, because that too, just like the nondischargeability stipulation, would have zero legal significance in the event that they eventually needed to file Chapter 11.

nondischargeability of Debtors' debt to L207 the focus of your position. If you do not, then you do. *See generally* Motion.

66.     The same general approach applied to settlement. In January 2025, Debtors' assets exceed their existing liabilities. In 2019, L207's unproven breach of contract and common law case was worth maybe $3 million dollars. If you jazz it all up and repackage your state law claims with RICO, then you can allege damages of $9 – 10 million with legal fees, costs, expenses, etc., which is what L207 did. But a few years into the Civil Action, the defendants and Debtors prevailed on summary judgment on a number of L207's claims, which (objectively anyway) seemed to result at the time in a reduction of Debtors' potential exposure to L207 from $6 million dollars back down to about $3 million.

67.     But that was not L207's view. After it lost summary judgment, it somehow had a new claim of over $7 million dollars. By January 2025, L207 was taking the position its claims were as high as $12 million dollars. No idea how, but that was the position.

68.     Given all this, and the fact that multiples of millions of dollars in legal fees had already been burned by all the parties in the case over the span of 6 years, Debtors agreed to settle with L207 for, at least for their part, $3.2 million dollars. Basically, after 6 years of litigation and probably $2 – 3 million in legal fees incurred on just their part alone, L207 "recovered" a total of $5 million dollars from all the defendants in the Civil Action. Well done.

69.     But faced with the Consent Judgment and a looming Disclosure Hearing, Debtors opted to file this case because Chapter 11 is the only place that protects them as judgment debtors, preserves their assets, and offers them a viable path for paying all their debts and creditors fairly, appropriately, and equally under the law. An out-of-bankruptcy Disclosure Process, regardless of whether L207 is a secured or unsecured creditor, does none of that.

70. While true that L207's judicial liens are just as avoidable in state court as they are in the Adversary Proceeding, even if L207's judicial liens are avoided or avoidable, it is still a judgment creditor of Debtors outside of Chapter 11. As such, it still could have requested that the District Court order a turnover or sale order with respect to the immediate liquidation of any or all of Debtors' real property assets. *See* 14 M.R.S. § 3131(1), (2). Inside Chapter 11, though, that is impossible. That is why filing Chapter 11 on the eve of any disclosure hearing can be vital and necessary for any Chapter 11 debtor, as it was for Debtors here.

71. Similarly, any order entered under 14 M.R.S. § 3131 also constitutes a lien against the asset ordered turned over or sold, which again, would have provided L207 with another avenue of recovery against Debtors or their assets to the detriment of their other legitimate creditors. Chapter 11 again prevents that and a race to the courthouse.

72. Inside Chapter 11 Debtors are protected and entitled to use federal bankruptcy law to reorganize their financial affairs. Outside of Chapter 11 they cannot and face rushed liquidation for the benefit of just 1 of their 13 creditors. This factor favors Debtors.

### 6.       Debtors have Little or No Cash Flow

73. This factor favors Debtors. Per their Schedules I and J, Debtors have net monthly income of approximately $5,000. *See* Schedules I and J. Any couple in Maine that has net income of $5,000 at the end of every month cannot objectively or truthfully be said to have little or no cash flow.

74. Debtors – 6. L207 – 0.

### 7.       Debtors Cannot Meet Current Expenses, including Payment of Personal Property and Real Estate Taxes

75. This factor favors Debtors. Per their Schedules I and J, Debtors have net monthly income of approximately $5,000. *See* Schedules I and J. Included within the expenses on their

-16-

Schedule J are itemizations for home ownership expenses, including mortgage payments that include escrows, all of which are consistently paid on a monthly basis without incident. *See* Schedule J, ¶ 4.

76. Debtors, admittedly, were unable to comply with and maintain their prepetition payment plan with Troutman to reduce, satisfy, and pay as they came due its outstanding claim for legal fees of between $250,000 and $350,000.

### 8.    Debtors have no Employees

77. This is a push. Debtors themselves have no employees. TBLP, when it is in operation between April and October as a lobster restaurant and business, has approximately 15 employees. Debtors are the 100% shareholders of TBLP and run the business, and they are therefore ultimately responsible for the employment and wages of all their (indirect) seasonal employees.

78. On November 21, 2025, L207 has scheduled a disclosure hearing for TBLP in the District Court.

79. Given the entirety of all these circumstances, it is anticipated that TBLP will too be required to file a Chapter 11 proceeding in order to continue to operate its business, employ its employees, and satisfy all its obligations to all its creditors, included L207. In the event of such a filing, it is expected that that case will either be jointly-administered with this one, or one Plan will be filed that incorporates Debtors and TBLP and their respective estates, or something similar as their interests are aligned.

80. For all these reasons, under the totality of all these circumstances, Debtors assert that there can be little, if no, doubt that this case was filed in good faith and that no "cause" exists to convert or dismiss under § 1112(b) of the Code. The Motion should be denied.

## IV.  **Responses Required by D. Me. LBR 9013-1(c)(2)**

81.     Debtors admit the first sentence of ¶ 3 of the Motion.  Debtors are without information or belief as the balance of the factual assertions set forth in ¶ 3 of the Motion.

82.     Debtors generally admit the factual assertions set forth in ¶ 4 of the Motion.

83.     Debtors are without information or belief as the balance of the factual assertions set forth in ¶ 5 of the Motion.

84.     Debtors generally deny the factual assertions set forth in ¶ 6 of the Motion.

85.     Debtors generally admit the facts, but not the characterizations, set forth in ¶ 7 of the Motion.

86.     Debtors generally admit the factual assertions set forth in ¶ 8 of the Motion.

87.     Debtors generally admit the factual assertions set forth in ¶ 9 of the Motion.

88.     Debtors admit the factual assertions set forth in ¶ 10 of the Motion.

89.     Debtors are without information or belief as the balance of the factual assertions set forth in ¶ 11 of the Motion.

90.     Debtors generally admit the factual assertions set forth in ¶ 12 of the Motion.

91.     Debtors generally admit the factual assertions set forth in ¶ 13 of the Motion.

92.     Debtors generally admit the factual assertions set forth in ¶ 14 of the Motion.

93.     Debtors admit the factual assertions set forth in ¶ 15 of the Motion.

94.     Debtors generally admit the factual assertions set forth in ¶ 16 of the Motion, but deny the legal conclusions contained therein.

95.     Debtors admit the factual assertions set forth in ¶ 17 of the Motion.

96.     Debtors generally admit the factual assertions set forth in ¶ 18 of the Motion.

97.     Debtors generally admit the factual assertions set forth in ¶ 19 of the Motion.

98.     Debtors generally admit the factual assertions set forth in ¶ 20 of the Motion.

99.     Debtors generally admit the factual assertions set forth in ¶ 21 of the Motion.

100.    Debtors generally admit the factual assertions set forth in ¶ 22 of the Motion.

101.    In response to the factual assertions set forth in ¶ 23 of the Motion, Debtors state that the Chapter 11 filings speak for themselves.

102.    In response to the factual assertions set forth in ¶ 24 of the Motion, Debtors state that the Chapter 11 filings speak for themselves.

103.    In response to the factual assertions set forth in ¶ 25 of the Motion, Debtors state that the Chapter 11 filings speak for themselves.

104.    In response to the factual assertions set forth in ¶ 25 of the Motion, Debtors state that the Chapter 11 filings speak for themselves.

## V.  Conclusion

WHEREFORE, Debtors and Debtors-in-Possession, Anthony D. Pettegrow and Josette G. Pettegrow, request that the Court: (i) deny Lobster 207, LLC's Motion to Dismiss as a matter of law; or, alternatively; (ii) at the hearing scheduled on L207's Motion to Dismiss, conduct a discovery conference in accordance with D. Me. LBR 9014-1(a)(3) such that any necessary discovery can be conducted in this contested matter, and that the matter be set for final hearing at a time convenient for the Court and parties; and (iii) grant them such other and further relief as may be just and equitable under the circumstances.

Dated at Portland, Maine this 31st day of October, 2025.

/s/ Randy J. Creswell
Randy J. Creswell, Esq.
Proposed Special Counsel for Debtors,
Anthony D. Pettegrow and
Josette G. Pettegrow

CRESWELLLAW
PO Box 7340
Portland, ME  04112
207.358.1010
rcreswell@creswelllaw.com

## CERTIFICATE OF SERVICE

I, Randy J. Creswell, Esq., hereby certify that I have served on this day copies of the above Opposition and this Certificate of Service upon each of the parties listed on the Notice of Electronic Filing via the Court's Administrative Procedures Governing the Filing and Service by Electronic Means (unless otherwise indicated below).

Dated at Portland, Maine this 31st day of October, 2025.

/s/ Randy J. Creswell
Randy J. Creswell, Esq.
Proposed Special Counsel for Debtors,
Anthony D. Pettegrow and
Josette G. Pettegrow

CRESWELLLAW
PO Box 7340
Portland, ME  04112
207.358.1010
rcreswell@creswelllaw.com